## Case No. 5,980.

### HAMILTON et al. v. EATON.[1]

[1 Hughes, 249;[2] 2 Mart. (N. C.) 1; Mart. (2d Ed.) 83; N. C. Cas. 77.]

Circuit Court, D. North Carolina. June, 1792.

#### CONFISCATED DEBTS—TREATY OF 1783.

When, during the war of Independence (1775 to 1783), a debt due from a citizen of North Carolina to a British subject had been confiscated to the use of that state by law of its legislature and been paid to its commissioners by the debtor, *held*, that under that clause of the treaty of peace of 1783, by which it had been stipulated that citizens of either side should meet with no lawful impediment in the recovery

[1] This report of the case is much condensed from a very elaborate report of the pleadings, argument of counsel, and opinions of judge, in pages 1–77, pt. 2, Francois Xavier Martin's Notes of North Carolina Cases, 1797.

[2] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

of bona fide debts contracted before the date of the treaty, judgment must be rendered for the plaintiff in a suit brought for such debt.

This was an action of debt upon a penal bill bearing date the 11th day of August, 1776, for the penal sum of eight hundred pounds, proclamation money, to be discharged by the payment of four hundred pounds, like money, payable on the first day of August, 1778, with lawful interest from that date. The plaintiffs, Archibald and John Hamilton, trading under the firm of Archibald Hamilton & Co., were subjects of Great Britain, but were residents of North Carolina before and at the time of the Declaration of Independence, July 4th, 1776. The defendant, John Eaton, was a citizen of the United States, and of North Carolina, and was a citizen of North Carolina before the said Declaration of Independence. There were several pleas to this action. It is useless, as the case turned on that, to state any other than the first and principal one of those pleas, which was, that a law of the state had required that all persons, subjects of the state, living therein, who had traded to Great Britain or Ireland, should take an oath of allegiance or depart out of the state; that the plaintiffs had departed out of the state, leaving their debt due them; that another law of the state had appointed commissioners to sequestrate debts of citizens due to subjects of Great Britain to the use of the state, which commissioners had duly sequestrated this debt, which the defendant had paid to them for the use of the state; and that, therefore, by the laws of war and the law of nations, the defendant did not owe this debt. To this plea it was replied, that by the treaty of peace, which was entered into between Great Britain and the United States, which terminated the war of the Revolution in 1783, it had been stipulated by the two powers, that "creditors on either side should meet with no lawful impediment to the recovery of bona fide debts heretofore contracted." To this replication there was a demurrer, and there was a joinder in the demurrer.

Mr. Davie, for plaintiffs.
Mr. Baker, for defendant.

Before ELLSWORTH, Circuit Justice, and SITGREAVES, District Judge.

SITGREAVES, District Judge. This is an action of debt brought by the plaintiffs, to recover of the defendant on an obligation made in the year 1776. The defendant has pleaded four several pleas in bar, which are now for the decision of the court by demurrer. I shall consider of the case as it appears by the first plea, which places the defendant on the most advantageous ground, as a decision on that will probably govern all the cases arising out of the subsequent pleas. The case as it appears by the first plea is as follows: The plaintiffs were merchants, residents of North Carolina, before and at the time of the Declaration of Inde-

pendence. By an act of the legislature of North Carolina, passed in April, 1777, it was among other things enacted "that all persons being subjects of this state, and now living therein, or who shall hereafter come to live therein, who have traded immediately to Great Britain or Ireland, within ten years last past, in their own right, or acted as factors, storekeepers, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, shall take an oath of abjuration and allegiance, or depart out of the state." By the same act, such persons were permitted to sell their estates, to export the amount thereof in produce, and to appoint attorneys to sell and dispose of their estates for their use and benefit. The plaintiffs falling within the description of persons contemplated by this act, and refusing to take the oath, departed the state, the debt which is the subject of the present suit then existing. By subsequent acts of the legislature, all the estates, rights, properties, and debts of certain persons, among which the plaintiffs are specially named, are declared to be confiscated, and the debts due to such persons are directed to be paid to certain commissioners, to be appointed by the county courts for that purpose, by all persons within the state owing the same, under pain of imprisonment, which payment it is declared shall forever indemnify and acquit the persons paying the same, their heirs, etc., against any future claim for the money mentioned in the receipts or discharges of such commissioners. In obedience to those acts, the defendant paid the debt in question to the commissioners authorized to receive it, and relies on that payment as legal, and a full and sufficient discharge; the plaintiffs admitting the fact of payment as legal on the construction of the treaty of peace, the constitution of the United States declaring that treaty to be part of the law of the land. The counsel for the plaintiffs in support of this claim has, in the course of his argument, presented to the view a doubt whether the debt in the present question has been confiscated in a strictly legal sense, by any of the acts called confiscation acts, and has urged the doubt strenuously, and with much force of argument, contemplating them as a body of penal law, and of course subject to the legal rules of construction in such cases. The observations on that point would merit much attention, but I deem it not absolutely necessary to investigate that question in forming an opinion of the present case, and shall confine my observations solely to the law and the facts, as they arise out of the pleadings in the first plea of the defendant, which admits alone of this question, viz.: Are the plaintiffs barred of recovery?

It would appear quite unnecessary to inquire whether congress, under whose authority the treaty was negotiated, was vested by the state with a power competent to en-

ter into such a contract, had not part of the argument of the defendant's counsel seemed to require it. No one will doubt if they had the power, the treaty consequently became obligatory on the people of the United States when made and duly ratified. Whatever agreement the states may have entered into at the Declaration of Independence, and to what purposes and extent that agreement may or may not have bound them, as a confederated body, it is clear that at a subsequent period, and previous to the negotiation of this treaty, they by their delegates in congress formed and entered into a solemn compact, by which they plight and engage the faith of their constituents to abide by the determination of the United States in congress assembled on all questions which by the confederation are submitted to them; and that the articles thereof shall be invariably observed by the states. Among many other portions of sovereignty which the states thought proper to deposit in that confederated head was the sole and exclusive right and power of determining on peace and war (except in certain cases specially enumerated), of sending and receiving ambassadors, entering into treaties and alliances. No words can be more comprehensible or express relative to the point in question; nor is there offered to my mind the least room of doubt. Admitting, for argument's sake, what has been contended, that the ministers who negotiated the treaty exceeded the powers granted them, certainly the ratification of that instrument by congress confirmed and legalized all that had been done by them; and if it could be supposed, as has been said, that congress in the ratification of it exceeded the powers vested in them by the state, the act of assembly of this state passed in 1787 must have extinguished every scintilla of doubt as to its validity and obligatory force on their citizens. That act is a perfect recognition of the whole treaty, declares it to be part of the law of the land, and directs the judges to decide accordingly. The last-mentioned act must surely be sufficient to satisfy the mind of the most scrupulous and skeptical. For myself, I do not hesitate to declare that it adds nothing to the validity and legality of the treaty; that its ratification by congress was alone sufficient, and that the act of assembly of the state was superfluous.

The counsel for the defendant has contended that by the operation of the acts of confiscation and the payment into the treasury, the plaintiffs were wholly divested of their right, and the same, if existing at all, was vested in the state. This forms a material part of his defence, and if it had been clearly evinced that the right of the plaintiffs was wholly extinguished by the operation of the confiscation acts, and could not possibly be revived or restored by any subsequent act of the state or the nation, it would follow of course that they could have no demand against the defendant. In sup-

port of this argument, it is said (4 Bac. Abr. 637) that all acts done under a statute while in force are good notwithstanding a subsequent repeal. I am ready to admit the principle in its fullest extent, in the exposition of a statute or municipal law of any particular state. It is consonant with reason, and is justified by the necessity of the case. It prevents much confusion and embarrassment, and insures a ready submission to the laws, by a confidence in the security impliedly promised to such obedience. If the treaty was now to be considered as an act of the state, and emanating from the same authority only that produced the acts of confiscation, this reasoning might be solid. But such an instrument as the treaty of 1783 cannot be subject to the ordinary rules of construction which govern the exposition of statutes of a particular state. They have for their object the regulation of the rights of a distinct community or society only, whose interests being similar, are equally affected by a uniform regulation of their rights; who are alike united by the allegiance due to and protection from the same government. That is not the case with a compact formed between two separate and distinct nations, relative to certain specified subjects which involve interests of their respective citizens or people, unavoidably clashing with each other. The one is an act of a state, but a component part of the nation providing for the benefit of its own citizens. The other a compact of the whole nation (of which that state is but a part) with another nation which must necessarily control all acts issuing from the inferior authority which might contravene it. This is evinced by that plain and strong expression in the constitution of the United States, which declares that all treaties made, or which shall be made, under the authority of the United States shall be the supreme law of the land, and the judges in every state shall be bound thereby; anything in the constitution or laws of any state to the contrary notwithstanding.

Taking it for granted, then, that the treaty is not to be governed, when in opposition to particular laws, by the rigid rules of the common law, nor to be restrained in its operation by any statute of any particular state, "but that it ought to be interpreted in such manner as that it may have its effect, and not be found vain and illusive," I will proceed to consider of the operation of the 4th article: "Art. 4th. It is agreed that creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contracted." This article appears to me so clear, precise, and definite that one would be at some loss to select other words to render it more so. But it has been contended by the defendant's counsel that by a true construction of this article, it will appear much less general than the expressions would warrant; that it is a provision for real British

subjects only, that is, persons resident in Great Britain at the commencement of the war; a term used in contradistinction to many other descriptions of people who in the course of the war took part with that nation; and that this construction is justified by the term "sterling money." In order to support this exposition a reference has been had to the 5th and 6th articles. The 4th article contains the only stipulation with respect to debts. In the whole instrument it is mutual and general in its expression, not limited or restrained by any particular words to any description of persons, as is evident in the 5th article. If that had been in the contemplation of the parties, they could not have overlooked the necessity for these distinctions, nor are we at liberty to presume it. In the next article the distinction is made with great accuracy with regard to those who may endeavor to procure a restitution of their lands and other property. With respect to the expression sterling money, it appears to me that was probably concluded on as a standard whereby to estimate the value of money due, it being no doubt apprehended that a depreciated paper medium circulated in many states of the Union, the nominal sum in which might not produce the intrinsic value of the debt due.

Another construction has been placed on this article, equally, in my opinion, unfounded with the foregoing. It has been said the article was only intended to take off from British subjects their disability as alien enemies to sue. Every one knows that disability can only exist during the continuance of a war; it would have been, therefore, unnecessary to provide for it in a treaty of peace, when it is obvious the peace itself, agreeably to the long-established principles of law, removed all such disability without any special stipulation. The word "recovery" admits of such an idea. The terms "sue" and "recover" have very different import in practice. The difference is daily exemplified in our courts, and the distinction appears evident in the body of that instrument. In the latter part of the 5th article it is stipulated that certain persons shall meet with no lawful impediment in the prosecution of their just rights. In the 4th article the words are, "no lawful impediment to the recovery of their debts." The distinction is obvious, and the terms aptly applied in each case. In the former, relative to lands and other property which had been confiscated, and a restoration of which entirely depended on the liberality of the legislatures, the term "recovery" would have been improper; in the latter, in which a payment to the creditor was positively stipulated, the expression is correct. Vattel says (page 369): "When an act is conceived in clear and precise terms, when the sense is manifest and leads to nothing absurd, there can be no reason to refuse the sense which this treaty presents; to go elsewhere in search of conjectures, in order to

extinguish or restrain it, is to endeavor to elude it." It is therefore my opinion that this article does control the operation of the acts of confiscation relative to debts; that the plaintiffs in this case are entitled to recover on the first demurrer, the plea in that case being the strongest ground of defence made by the defendant; that, therefore, judgment be given for the plaintiffs on each of the demurrers. The state, who has compelled the payment from the creditor by a threat of severe punishment, will certainly feel bound by every principle of moral obligation to reimburse, in the most ample manner, all those who have made such payments. In addition to the moral tie that it is bound by, a solemn promise so to do is clearly expressed by an act of the legislature. I have only to observe that I have considered this case as of the utmost importance; that I have given it all the attention and consideration in my power to bestow at this time and place; that if my opinion is founded in error, which is possibly the case, happily for the defendant there is a higher tribunal where the error may be corrected.

ELLSWORTH, Circuit Justice. It is admitted that the bond on which this suit is brought was executed by the defendant to the plaintiffs, and that the plaintiffs have not been paid. But the defendant pleads that since the execution of the bond a war has existed, in which the plaintiffs were enemies, and that during the war this debt was confiscated, and the money paid into the treasury of the state; and the plaintiffs reply that, by the treaty which terminated the war, it was stipulated that creditors "on either side should meet with no lawful impediment to the recovery of bona fide debts heretofore contracted."

Debts contracted to an alien are not extinguished by the intervention of a war with his nation. His remedy is suspended while the war lasts, because it would be dangerous to admit him into the country, or to correspond with agents in it, and also because a transfer of the treasure from the country to his nation would diminish the ability of the former, and increase that of the latter, to prosecute the war. But with the termination of hostilities these reasons, and the suspension of the remedy, cease. As to the confiscation here alleged, it is doubtless true that enemy's debts, so far as consists in barring the creditor and compelling payment from the debtors for the use of the public, can be confiscated, and that on principles of equity, though perhaps not of policy, they may be, for their confiscation, as well as that of property of any kind, may serve as an indemnity for the expenses of war, and as a security against future aggression. That such confiscations have fallen into disuse, has resulted, not from the duty to which one nation, independent of treaties, owes to another, but from commercial policy, which

European nations have found a common, and, indeed, a strong interest in supporting. Civil war, which terminates in a severance of empire, does, perhaps less than any other, justify the confiscation of debts, because of the special relation and confidence subsisting at the time they were contracted, and it may have been owing to this consideration, as well as others, that the American States, in the late Revolution, so generally forbore to confiscate the debts of British subjects. In Virginia they were only sequestered; in South Carolina all debts, to whomsoever due, were excepted from confiscation; as were in Georgia those of British merchants and others residing in Great Britain. And in the other states, except this, I do not recollect that British debts were touched. Certain it is that the recommendation of congress on the subject of confiscation did not extend to them. North Carolina, however, judging for herself, in a moment of severe pressure, exercised the sovereign power of passing an act of confiscation, which extended among others, to the debts of the plaintiffs, providing, however, at the same time, as to all debts which should be paid into the treasury under that act, that the state would indemnify the debtors should they be obliged to pay again.

Allowing then, that the debt in question was in fact and of right confiscated, can the plaintiffs recover by the treaty of 1783? The 4th article of that treaty is in the following words: "It is agreed that creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money, of all bona fide debts heretofore contracted." There is no doubt but the debt in question was a "bona fide" debt, and theretofore contracted, i. e., prior to the treaty. To bring it within the article. it is also requisite that the debtor and creditor should have been on different sides with reference to the parties to the treaty; and, as the defendant was confessedly a citizen of the United States, it must appear that the plaintiffs were subjects of the king of Great Britain; and it is pretty clear, from the pleadings and the laws of the state, that they were so. It is true, that on the 4th of July, 1776, when North Carolina became an independent state, they were inhabitants thereof, though natives of Great Britain; and they might have been claimed and holden as citizens, whatever were their sentiments or inclination. But the state afterwards, in 1777, liberally gave to them with others similarly circumstanced, the option of taking an oath of allegiance, or of departing the state under a prohibition to return, with the indulgence of a time to sell their estates, and collect and remove their effects. They chose the latter, and ever after adhered to the king of Great Britain, and must therefore be regarded as on the British side. It is also pertinent to the inquiry whether the debt in question be within the before recited article, to notice an objection which has been stated by the defendant, viz.,

that at the date of the treaty, what is now sued for as a debt, was not a debt but a nonentity; payment having been made, and a discharge effected under the act of confiscation, and therefore that the stipulation concerning debts did not reach it. In the first place it is not true that in this case there was no debt at the date of the treaty. A debt is created by contract, and exists until the contract is performed. Legislative interference to exonerate a debtor from the performance of his contract, whether upon or without conditions, or to take from the creditor the protection of law, does not in strictness destroy the debt, though it may, locally, the remedy for it. The debt remains, and in a foreign country payment is frequently enforced. Secondly, it was manifestly the design of the stipulation that where debts had been theretofore contracted there should be no bar to their recovery from the operation of laws passed subsequent to the contracts. And to adopt a narrower construction would be to leave creditors to a harder fate than they have been left to by any modern treaty.

Upon a view then of all the circumstances of this case, it must be considered as one within the stipulation that there should be "no lawful impediment to a lawful recovery." And it is not to be doubted that impediments created by the act of confiscation are lawful impediments. They must therefore be disregarded if the treaty is a rule of decision. Whether it is so or not remains to be considered. Here it is contended by the defendant's counsel that the confiscation act has not been repealed by the state; that the treaty could not repeal or annul it; and therefore that it remains in force, and secures the defendant. And further, that a repeal of it would not take from him a right vested, to stand discharged. As to the opinion that a treaty does not annul a statute, so far as there is an interference, it is unsound. A statute is a declaration of the public will and of high authority, but it is controlled by the public will subsequently declared. Hence the maxim that when two statutes are opposed to each other, the latter abrogates the former. Nor is it material as to the effect of the public will, what organ it is declared by, provided it be an organ constitutionally authorized to make the declaration. A treaty, when it is in fact made, is, with regard to each nation that is a party to it, a national act, an expression of the national will as much so as a statute can be. And it does, therefore, of necessity annul any prior statute so far as there is an interference. The supposition that the public can have two wills at the same time, repugnant to each other, one expressed by a statute, and another by a treaty, is absurd.

The treaty now under consideration was made on the part of the United States, by a congress composed of deputies from each state, to whom were delegated by the articles of confederation, expressly, "the sole and exclusively right and power of entering into treaties and alliances;" and being ratified and made by them, it became a complete national act and law of every state. If, however, a subsequent sanction of this state was at all necessary to make the treaty law here, it has been had and repeated. By a statute passed in 1787, the treaty was declared to be law in this state, and the courts of law and equity were enjoined to govern their decisions accordingly. And in 1789 was adopted here the present constitution of the United States, which declared that all treaties made, or which should be made, under the authority of the United States, should be the supreme law of the land, and that the judges in every state should be bound thereby; anything in the constitution or laws of any state to the contrary notwithstanding. Surely, then, the treaty is now law in this state, and the confiscation act, so far as the treaty interferes with it, is annulled. Still it is urged, that annulling the confiscation act cannot annul the defendant's right of discharge, against which the act was in force. It is true, that the repeal of a law does not make void what has been well done under it. But it is also true, admitting the right here claimed by the defendant to be as substantial as a right of property can be, that he may be deprived of it, if the treaty so requires. It is justifiable and frequent, in the adjustment of national differences, to concede for the safety of the state, the rights of individuals. And they are afterwards indemnified or not according to circumstances. What is most material to be here noted is that the right or obstacle in question, whatever it may amount to, has been created by law, and not by the creditors. It comes within the description of "lawful impediments," all of which in this case, the treaty, as I apprehend, removes. Let judgment be for the plaintiffs.