# Supreme Court of Texas

No. 21-0769

Angela Horton and Kevin Houser,

*Petitioners*,

v.

The Kansas City Southern Railway Company,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

JUSTICE BUSBY, joined by Justice Devine, Justice Blacklock, and Justice Young, concurring.

The heart of this case should be decided as a straightforward question of statutory interpretation: when both chambers of the United States Congress passed and the President signed the Interstate Commerce Commission Termination Act (ICCTA) in 1995, did they actually delegate to the Surface Transportation Board (STB) exclusive jurisdiction over humped railroad crossings, preempting state common-

law negligence suits concerning accidents at such crossings? I join the Court's opinion, which holds that the answer to this question is no.[1]

In addition to deciding this question of express preemption, precedent from the Supreme Court of the United States requires us to consider implied obstacle preemption. Under *Hines v. Davidowitz* and its progeny, we must analyze whether allowing the plaintiffs to bring their claim in court would stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 312 U.S. 52, 67 (1941).

Although I agree with my colleagues that the claim before us presents no such obstacle, I am concerned that this doctrine has developed in a manner that poses questions judges are neither authorized to ask under our Constitution nor able to answer in a consistent and principled manner. As Justice Clarence Thomas has observed for two decades, "implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution." *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring in judgment). In particular, implied obstacle preemption invites judges to imagine what the unexpressed "purposes and objectives" of Congress might have been and speculate about whether there is tension between those purposes and state law that rises to the level of an "obstacle." Such creativity seems especially misplaced when (as here) the statute includes an express preemption clause, which "necessarily contains the

---

[1] Justice Devine and I join the Court's opinion in full. Justices Blacklock and Young join this concurring opinion and Parts I-III of the Court's opinion, but they do not join Part IV of that opinion, which addresses a separate issue, or the Court's judgment.

best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Justice Thomas has urged the Court to abandon its "purposes and objectives" approach to implied preemption in favor of a test that asks whether state law stands in "logical contradiction" to federal law. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 319 (2019) (Thomas, J., concurring). This test, which draws on the research of Professor Caleb Nelson,[2] commendably seeks to refocus the Court's preemption precedent on the original public meaning of the Supremacy Clause. In its lack of originalist provenance, empirical unworkability, encouragement of standardless judicial discretion, and constitutionally illegitimate aggregation of federal power, the Supreme Court's "purposes and objectives" preemption jurisprudence suffers from flaws akin to those that recently led the Court to repudiate the *Lemon* test. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (overruling *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

Moreover, because ICCTA's preemption clause is coupled with a delegation of exclusive jurisdiction to the STB, administrative law principles should inform the proper preemption analysis. The presumption underlying the Supreme Court's implied obstacle preemption jurisprudence is exactly contrary to that underlying its recent federal administrative law jurisprudence—particularly the major questions doctrine and the principle that clear statutory direction is required to transfer core state power to a federal agency. Instead of the

---

[2] Caleb Nelson, *Preemption*, 86 VA. L. REV. 225 (2000).

statutorily prescribed scope of an agency's powers giving rise to a presumption that Congress did *not* mean to delegate major questions outside that scope exclusively to the agency, implied obstacle preemption presumes that matters outside that scope are also withdrawn from other decisionmakers as necessary to fulfill Congress's "purposes and objectives."

These two approaches to federalism, the separation of powers, and statutory interpretation are irreconcilable. Because this case painfully illustrates the failures of implied obstacle preemption's "'ambitiou[s],' abstract, and ahistorical"[3] approach to what is one of the "most frequently used doctrine[s] of constitutional law in practice,"[4] I write separately to urge the Supreme Court to reconsider *Hines* and its progeny.

## I.   ICCTA does not expressly preempt ordinary state common-law claims.

ICCTA provides that "[t]he jurisdiction of the [STB] . . . is exclusive" over (1) "transportation by rail carriers" and the "remedies provided by this part [of the Act] with respect to" matters including carriers' rates, operating rules, routes, services, and facilities, and (2) "the construction, acquisition, operation, abandonment, or discontinuance of" tracks or facilities. 49 U.S.C. § 10501(b). The next sentence goes on to say that "the remedies provided under this part with

---

[3] *Kennedy*, 597 U.S. at 534 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019)).

[4] Steven A. Gardbaum, *The Nature of Preemption*, 79 CORNELL L. REV. 767, 768 (1994).

4

respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.*

The text and context of Section 10501(b) make clear that ordinary state common-law claims regarding rail crossing safety are not expressly preempted by this second sentence. Instead, as I explain below, state- and federal-law remedies "with respect to *regulation* of rail transportation" include only laws that are specifically directed toward managing or governing the aspects of rail transportation that the statute gives the STB exclusive jurisdiction to regulate. And the state and federal "*remedies*" Congress preempted in Section 10501(b) are those that Congress granted the STB exclusive jurisdiction to provide regarding economic and operational aspects of rail transportation.

Throughout this case, respondent KCSR has emphasized the wrong question. The central issue Congress sought to address in ICCTA generally, and within Section 10501(b) in particular, was *not* the scope of federal preemption of state-law claims. Rather, Congress was focused on specifying the parameters of exclusive regulatory power being delegated to an executive branch agency, and Congress provided for preemption of state and federal "remedies" to ensure that the agency's jurisdiction within the specified range of its expertise was exclusive. Thus, instead of asking whether Congress deprived state courts of the ability to address common-law negligence claims such as the ones at issue here, we should be asking whether Congress clearly delegated to the STB the exclusive authority to provide a remedy.

The answer to that question is no. Like generally applicable "state property laws and rules of civil procedure that" on their face

5

"'have nothing to do with railroad crossings,' . . . state negligence law" typically has "effects . . . on rail operations [that] are merely incidental"; thus, ordinary negligence claims do not qualify as preempted "regulation of rail transportation." *Elam v. Kan. City S. Ry.*, 635 F.3d 796, 813 (5th Cir. 2011) (quoting *Franks Inv. Co. v. Union Pac. R.R.*, 593 F.3d 404, 411 (5th Cir. 2010) (en banc)).[5]  Instead, "State law[s]" that provide remedies "with respect to *regulation* of rail transportation" are laws—generally positive laws—that are specifically directed toward managing or governing such transportation.[6]  This statutory phrase "necessarily means something qualitatively different from laws 'with respect to rail transportation.'" *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001).  An overly broad reading of Section 10501(b)'s express preemption provision would deprive the word

---

[5] Under this rule, the only common-law claims expressly preempted by ICCTA will typically be negligence per se claims based on statutes, regulations, or ordinances that directly regulate an aspect of rail transportation over which the STB has exclusive jurisdiction.  *See also Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 444 (5th Cir. 2001).  I express no view regarding whether a state court could recognize a particular common-law negligence duty so specifically tailored to rail transportation that it would qualify as preempted "regulation."

[6] *Elam*, 635 F.3d at 805-07; *Franks Inv. Co.*, 593 F.3d at 411; *Emerson v. Kan. City S. Ry.*, 503 F.3d 1126, 1130-31 (10th Cir. 2007) (McConnell, J.); *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260-62 (2013) (observing that phrase "with respect to" limits preemptive scope to laws that directly "concern" or "involve" the matter described); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) (explaining that "[a] common-sense view of the word 'regulates' would lead to the conclusion" that a law regulates a subject if it is "specifically directed toward that" subject).

6

"regulation" of independent meaning,[7] and the Court appropriately declines to follow KCSR down that path.

In addition, although this section gives the STB exclusive jurisdiction to regulate certain economic and operational aspects of rail transportation and provides remedies with respect to that regulation, it does not preempt "all other law" regarding those aspects of rail transportation—a phrase Congress used elsewhere to preempt laws that would limit the STB's exclusive authority to permit railroad mergers and acquisitions.[8] 49 U.S.C. § 11321. Instead, Section 10501(b) focuses its preemptive force more narrowly on state- and federal-law "remedies" that Congress granted the STB exclusive jurisdiction to "provid[e] under this part" of ICCTA. Here, KCSR identifies no "remedies provided under this part" that would bear on plaintiffs' common-law negligence claim regarding crossing safety, so it is not preempted.

---

[7] *Cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002) ("[T]he terms 'law' and 'regulation' used together in the pre-emption clause indicate that Congress pre-empted only positive enactments. If 'law' were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render the express reference to 'regulation' in the pre-emption clause superfluous."). As in *Sprietsma*, the word "regulation" here must be given a meaning different from "law," though "regulation" is used somewhat differently in each statute. The statute at issue in *Sprietsma* generally preempts (among other things) a state or local "law or regulation" establishing boating safety standards or equipment requirements not identical to federal regulations, 46 U.S.C. § 4306, while the statute at issue here preempts "remedies provided under Federal or State law" "with respect to regulation of rail transportation." 49 U.S.C. § 10501(b).

[8] *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (Scalia, J.) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme.").

7

Section 10501(b) is "unlike a typical preemption provision."[9] Rather, it is a jurisdictional provision designed to establish an exclusive zone of jurisdiction[10] for the STB in areas within its defined range of economic and operational expertise, under which it provides parties with "remedies" that are different from those offered by other federal agencies that regulate railroad safety: the Federal Railroad Administration (FRA), Federal Transit Administration (FTA), and National Transportation Safety Board (NTSB).[11] By ensuring that the various federal agencies regulating railroads stay in their proverbial lanes, Section 10501(b) is designed (for example) to prevent the FRA from setting railroad rates while preserving its authority to establish "metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations."[12]

This backdrop of multiple federal agencies with different zones of jurisdiction confirms that the STB's professed expertise in the economic and non-safety operational regulation of railroads—namely "railroad

---

[9] *Kansas v. Garcia*, 589 U.S. 191, 204 (2020) (discussing 8 U.S.C. § 1324a).

[10] Because Section 10501(b) is a jurisdictional statute that delegates power from Congress to a federal administrative agency, we must also read it with a careful eye toward the capaciousness of the power, as we assume that Congress did not intend to "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[11] Federal administrative law emphasizes a close relationship between an agency's substantive policy expertise and the scope and nature of its authority. "When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority." *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019).

[12] 49 C.F.R. § 273.1.

8

rate, practice, and service issues and rail restructuring transactions, including mergers, line sales, line construction, and line abandonments"[13]—would not be implicated by suits under generally applicable tort law. The Federal Railroad Safety Act (FRSA) expressly recognizes as much, including savings clauses to clarify that state laws and causes of action relating to railroad safety are not preempted unless they are incompatible with federal rules on the subject. 49 U.S.C. § 20106(a)(2), (b)(1).

Nothing about the claim at issue here, or common-law negligence claims in general, implicates the STB's expertise. Indeed, the STB has firmly declined to exercise jurisdiction over such cases, stating its view that common-law negligence claims involving rail crossing accidents are regulated by FRSA, not ICCTA.[14] "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941) (Frankfurter, J.)).

---

[13] *About STB*, SURFACE TRANSP. BD., https://www.stb.gov/about-stb/ (last visited June 20, 2024).

[14] *See, e.g.*, Waneck, Fed. Carr. Cas. P 37399 (S.T.B. May 23, 2018) (pet. for declaratory order); Waneck et al. Pet. for Declaratory Order and on Motion for Reconsideration, No. FD 36167, 2018 WL 5723286 (S.T.B. Oct. 31, 2018) (denying reconsideration). *Cf.* Tubbs, No. FD 35792, 2014 WL 5508153, at *4 (S.T.B. Oct. 29, 2014) (pet. for declaratory order) (holding that plaintiffs' common-law tort claims, arising from railroad's failure to provide adequate drainage on tracks that damaged adjacent property during flood, were preempted under ICCTA).

Given the STB's view, holding that ICCTA preempts plaintiffs' common-law negligence theory regarding the humped crossing would likely leave them without a forum to adjudicate that theory, effectively granting the railroad immunity from any negligence regarding the hump. "[U]nlike most administrative and legislative regulations," state-law tort claims "necessarily perform an important remedial role." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002). As the Supreme Court has observed, "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by" conduct contrary to law. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984). In addition, such a holding would be difficult to reconcile with the FRSA savings clauses as well as the U.S. Supreme Court's longstanding view that "[t]he care of grade crossings is peculiarly within the police power of the [S]tates." *Lehigh Valley R.R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 35 (1928).

For over half a century, our Court has adhered to the principle that "if a statute . . . deprives a person of a common law right, the statute will be strictly construed in the sense that it will not be extended beyond its plain meaning or applied to cases not clearly within its purview." *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969).[15] The U.S. Supreme Court has adopted a similar presumption, holding that "[i]n order to abrogate a common-law principle, the statute must speak

---

[15] We reaffirmed this principle just last year in *American National Insurance Co. v. Arce*, where we refused to hold that a statutory scheme had the effect of destabilizing more than a hundred years of common-law precedent because the two could be read in harmony with each other. 672 S.W.3d 347, 359 (Tex. 2023).

directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation marks omitted). In addition, "Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (internal quotation marks omitted). And courts "would not expect Congress to take . . . [the] extraordinary step" of "stripping state courts of jurisdiction to hear their own *state* claims" without a "clear statement." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1351 (2020).

Section 10501(b) does not satisfy any of these clear-statement rules. Thus, KCSR continues to be subject to the Texas common law of torts.

In sum, the words "regulation" and "remedies" in Section 10501(b) mean that ICCTA expressly preempts statutes, ordinances, and regulations passed or promulgated by any body other than the STB or Congress that directly regulate an aspect of rail transportation safety or operations for which ICCTA provides a remedy. Because ordinary common-law tort claims like those at issue here are not included in this category, they are not expressly preempted by ICCTA's exclusive jurisdiction provision.

## II. Implied obstacle preemption is inconsistent with the Supremacy Clause.

In addition to express preemption, the U.S. Supreme Court has held that federal law impliedly preempts state law in two circumstances: (1) when a "pervasive" framework of regulation supports the inference that "Congress, acting within its proper authority, has determined [that

11

a field] must be regulated by its exclusive governance," and (2) when state law "conflict[s] with federal law," either because compliance with both "is a physical impossibility" or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and citations omitted). KCSR contends that this last variety of preemption—implied obstacle preemption—also applies to plaintiffs' humped-crossing negligence claim.[16]

KCSR's contention requires us to apply a body of U.S. Supreme Court jurisprudence that has been criticized as unconstrained, unworkable, and "completely unmoored from the original understanding of the Constitution." Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J.L. & LIBERTY 44, 54 (2019). The process of applying the "purposes and objectives" preemption doctrine to these facts amply illustrates why that doctrine ought to be reexamined by the Supreme Court. Instead of asking judges to engage in a purposivist analysis that relies on guesswork and innuendo and yields unpredictable results, the implied preemption inquiry could focus on whether federal and state law "are in logical contradiction." *Merck*, 587 U.S. at 319 (Thomas, J., concurring). Only when this conflict is concrete and unavoidable, rather than merely abstract and hypothetical, would

---

[16] Implied "obstacle" preemption is the only variety of implied preemption that could possibly be implicated by this case. Congress did not intend to wholly occupy the field of railroad safety, as FRSA's savings clauses demonstrate. *See* 49 U.S.C. § 20106(a)-(b). In addition, it is not actually impossible to comply with both Texas common-law negligence standards and relevant federal law, as there are no federal statutes or regulations prescribing standards for humped railroad crossings.

judges hold that state law is preempted by operation of the Supremacy Clause.

## A. The Supremacy Clause is a *non obstante* provision allowing federal laws to "repeal" contradictory state laws.

The Supremacy Clause provides that our federal Constitution, laws, and treaties "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws or any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. An originalist analysis reveals that this text adopts a straightforward rule: federal law repeals contradictory state law by implication.[17] As Professor Caleb Nelson has explained:

> Taken as a whole, the Supremacy Clause says that courts must apply all valid rules of federal law. To the extent that applying state law would keep them from doing so, the Supremacy Clause requires courts to disregard the state rule and follow the federal one. But this is the extent of the preemption it requires. Under the Supremacy Clause, any obligation to disregard state law flows entirely from the obligation to follow federal law.

> To put the same point slightly differently, the Supremacy Clause's rules of applicability and priority mean that courts are always bound to apply the federal portion of "in-state law." But if it is possible for courts simultaneously to follow the state portion of "in-state law," then the Supremacy Clause's demand that courts apply federal law does not prevent them from applying state law too. *The*

---

[17] As understood by the founding generation, "repeal" in this context refers to Congress's ability—by passing a statute or ratifying a treaty—to supersede contradictory state law. Of course, the state law is not literally removed from the statute books. Throughout my discussion, I also use repeal in this functional, non-literal sense.

*constitutional test for preemption is thus the same as the traditional test for repeal: Can state and federal law stand together, or do they establish contradictory rules*?[18]

As Professor Nelson notes, the final phrase of the Supremacy Clause—which operationalizes the superiority of federal law over state law when the two are contradictory—is a *non obstante* clause. Such clauses were "ubiquitous in the session laws of every state"[19] in late eighteenth century America, and were used

> to acknowledge that a statute might contradict some other laws and to instruct courts not to apply the traditional presumption against implied repeals. When a statute contained a non obstante clause, courts did not have to struggle to harmonize the statute with prior laws; they could give the statute its natural meaning and let it displace whatever law it contradicted.[20]

---

[18] Nelson, *Preemption*, 86 VA. L. REV. at 252 (emphasis added).

[19] *Id.* at 240.

[20] *Id.* at 232. *See also Opinion of the Mayor's Court* (August 27, 1784) in 1 THE LAW PRACTICE OF ALEXANDER HAMILTON 417 (Julius Goebel Jr., ed., 1964) (In this case litigated by Alexander Hamilton, the court applied the presumption against implied repeals to reconcile New York's Trespass Act, which allowed property owners to seek damages for trespass from those who had lived in their homes during the British occupation of New York, with the Treaty of Paris. As its opinion explains, the Trespass Act "doth not contain even the common non obstante clause, tho' it is so frequent in our statute book," and thus the "established maxim" applies: "where two laws are seemingly repugnant, and there be no clause of non obstante in the latter, they shall, if possible, have such construction, that the latter may not repeal the former by implication."); 4 M. BACON, A NEW ABRIDGEMENT OF THE LAW 639 (4th ed. 1778) ("Although two Acts of Parliament are *seemingly repugnant*, yet if there be no Clause of non Obstante in the latter, they shall if possible have such Construction, that the latter may not be a Repeal of the former by Implication.") (cited in *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) (plurality op. of Thomas, J.)).

The use of *non obstante* language in the Supremacy Clause—which only speaks explicitly to the obligations of state court judges—is important because it clarifies that the natural meaning of federal statutes would "take effect automatically within each state and form part of the same body of jurisprudence as state statutes,"[21] thus becoming "in-state law."[22] Absent this clarifying provision, the Framers of our federal Constitution feared that state court judges, consistent with "prevailing conceptions of the law of nations," would treat federal law as the law of a foreign sovereign and refuse to apply it.[23] Nowhere was this fear more acute than in the foreign affairs context, as numerous sources from the founding era raised fears of state legislation displacing federally ratified treaties.[24]

---

[21] Nelson, *Preemption*, 86 VA. L. REV. at 246.

[22] Evan Caminker, *State Sovereignty and Subordinacy: May Congress Commandeer State Officers to Implement Federal Law?*, 95 COLUM. L. REV. 1001, 1023 (1995).

[23] Nelson, *Preemption*, 86 VA. L. REV. at 246-47. Indeed, the Framers were familiar with this problem in multiple dimensions, as they had seen the states openly defy national laws passed under the Articles of Confederation with impunity. As Alexander Hamilton put it, "[t]he measures of the union have not been executed: the delinquencies of the States have, step by step, matured themselves to an extreme, which has at length arrested all the wheels of the national government, and brought them to an awful stand." THE FEDERALIST NO. 15 (Alexander Hamilton) (Gideon ed., 2001) [hereinafter FEDERALIST].

[24] *See, e.g.*, 4 DEBATES IN THE SEVERAL STATE CONVENTIONS, ON THE ADOPTION OF THE FEDERAL CONSTITUTION 188 (Jonathan Elliot 2d ed., 1836) [hereinafter ELLIOT] (reporting Governor Johnston's remarks in the North Carolina ratifying convention, including the Governor's statement that "[w]ithout this [Supremacy] clause, the whole Constitution would be a piece of blank paper. Every treaty should be the supreme law of the land; without this,

Most important for our purposes, both supporters and opponents of the Supremacy Clause discussed preemption in terms of "repeal," as the extensive debate over the clause in the North Carolina ratifying convention and other contemporary fora reveals.[25] This framework for

any one state might involve the whole Union in war."); *id.* at 278-80 (reporting Gen. Charles Cotesworth Pinckney's statement at the South Carolina ratifying convention that the Supremacy Clause would prevent states from undermining treaties entered into by the federal government). *See also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1832, 696 (1833) ("[T]reaty stipulations (especially those of the treaty of peace of 1783) were deemed by the states, not as laws, but like requisitions, of mere moral obligation, and dependent upon the good will of the states for their execution . . . . It was probably to obviate this very difficulty, that this [Supremacy] clause was inserted in the constitution.").

[25] Opponents of the Supremacy Clause described it as "a total repeal of every act and constitution of the states" that "[t]he judges are sworn to uphold," 4 ELLIOT at 179-180 (remarks of Mr. Bloodworth), under which state laws "could be repealed entirely by those of Congress," *id.* at 188 (remarks of Mr. J. M'Dowall), and treaties that are "the supreme law of the land . . . may repeal the laws of different states, and render nugatory our bill of rights," *id.* at 215 (remarks of Mr. Lancaster). To this, Governor Johnston, a supporter of ratification, responded by clarifying that "[t]he laws made in pursuance [of the Constitution] by Congress ought to be the supreme law of the land; otherwise any one state might repeal the laws of the Union at large," and "it would be in the power of any one state to counteract the law of other states, and withdraw itself from the Union." *Id.* at 187-88. Consistent with the trend at the North Carolina ratifying convention, the Anti-Federalist Papers are replete with references to the Supremacy Clause as "repealing" state law. *See, e.g.*, 221 Brutus II, N.Y. J. (Nov. 1, 1787), *reprinted in* 13 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 529 (John P. Kaminski & Gaspere J. Saladino eds., 1981) [hereinafter DHRC] ("It is therefore not only necessarily implied thereby [by the Supremacy Clause and the General Oath or Affirmation Clause], but positively expressed, that the different state constitutions are repealed and entirely done away, so far as they are inconsistent with this, with the laws which shall be made in pursuance thereof, or with treaties made, or which shall be made, under the authority of the United States; of what avail will the constitutions of the respective states be to preserve the rights of its citizens?"); An Old Whig VI, PHILA. INDEP.

thinking about preemption continued to dominate in the early days of the Republic. For instance, the Judiciary Act of 1789 only gave the U.S. Supreme Court appellate jurisdiction over final judgments of state high courts "where is drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of their being *repugnant* to the constitution, treaties or laws of the United States," and the decision was "in favour of . . . their validity."[26] By the same token, the Bankruptcy Act of 1800 included a savings clause providing that "this act shall not repeal or annul, or be construed *to repeal or annul the laws of any state* . . . for the relief of insolvent debtors, except so far as the same may respect persons who are, or may be clearly within the purview of this act . . . ."[27]

Early American jurists—including Chief Justice Oliver

---

GAZETTEER (Nov. 24, 1787), *reprinted in* 14 DHRC 216 (1983) ("Congress, being the supreme legislatures, may annul or repeal the laws of the individual states, whenever they please."). *See also* Andrew S. Oldham, *The Anti-Federalists: Past as Prologue*, 12 N.Y.U. J.L. & LIBERTY 451, 456 (2019) ("[W]e should read the Federalists' papers *together with* the Anti-Federalists' papers to elucidate the original public understanding of the Constitution."). But the Anti-Federalists' campaign against the Supremacy Clause "repealing" state law was not limited to publishing political propaganda. In Maryland, William Paca proposed to amend the Constitution to include a savings clause for state constitutions and bills of rights: "No Law of Congress, or Treaties, shall be effectual to repeal or abrogate the Constitutions, or Bills of Rights, of the States, or any of them, or any Part of the said Constitutions or Bills of Rights." *Amendments Proposed by William Paca in the Maryland Convention*, MD. J. (Apr. 29, 1788), *reprinted in* 17 DHRC 241 (1995).

[26] Judiciary Act of 1789, ch. 20, § 25, 1 Stat 73, 85-86 (emphasis added).

[27] An Act to establish a uniform System of Bankruptcy throughout the United States, ch. 19, § 61, 2 Stat 19, 36 (1800) (emphasis added).

Ellsworth,[28] Chief Justice John Marshall,[29] and Justice Joseph Story[30]—also understood the Supremacy Clause as repealing state laws that were "repugnant" to the federal Constitution, federal statutes, and treaties. In requiring actual "repugnancy" or irreconcilability between state and federal law before applying preemption, early American jurisprudence understood the Supremacy Clause's nature as a product of compromise between proponents and opponents of James Madison's failed proposal at the Philadelphia Convention for a national veto over state laws.[31]

---

[28] *See Hamilton v. Eaton*, 11 F. Cas. 336, 340 (C.C.D.N.C. 1792) (No. 5,980) (opinion of Ellsworth, Circuit Justice).

[29] *McCullough v. Maryland*, 17 U.S. (4 Wheat.) 316, 425-26 (1819) (declaring that preemption under the Supremacy Clause meant that "[a] law, absolutely repugnant to another, as entirely repeals that other as if express terms of repeal were used.").

[30] 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1836, 701 ("[T]he judiciary of the United States has no general jurisdiction to declare acts of the several states void, unless they are repugnant to the constitution of the United States, notwithstanding they are repugnant to the state constitution.").

[31] *See* 4 THE FOUNDERS CONSTITUTION 592-97 (Phillip B. Kurland & Ralph Lerner eds., 1987). *Compare* Alison L. LaCroix, *What if Madison Had Won? Imagining A Constitutional World of Legislative Supremacy*, 45 IND. L. REV. 41, 50 (2011) (observing that had the negative actually succeeded, "[t]he potential scope of Congress's power in a world with the negative would have been far broader than the actual scope of Congress's power when it preempts state law"), *with* Thomas W. Merrill, *Preemption and Institutional Choice*, 102 NW. U.L. REV. 727, 735 (2008) ("[S]ince the Supremacy Clause was expressly adopted as a substitute for Madison's sweeping 'negative,' it is doubtful that the Clause was regarded as being limited to cases of mutual exclusivity or trumping. The Framers must have also contemplated some degree of displacement power.").

The "repugnancy" or irreconcilability standard is also consistent with the original understanding of the Constitution as a document that transferred sovereign rights from the states to the federal government against the backdrop of the late eighteenth century law of nations. *See* Anthony J. Bellia, Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 COLUM. L. REV. 835, 878 (2020); Anthony J. Bellia, Jr. & Bradford R. Clark, *The Constitutional Law of Interpretation*, 98 NOTRE DAME L. REV. 519, 536 (2022). Under these legal principles, an "instrument could alienate sovereign rights and powers in two ways. It could either transfer the right or power expressly, or grant one party an express right or power that by unavoidable implication divested the other party of a corresponding right. In both cases, the clear and express terms of the instrument were to be given their ordinary and customary meaning as of the time of adoption." 98 NOTRE DAME L. REV. at 530-31.[32] As Professors Bellia and

---

[32] *See* FEDERALIST NO. 32 (Alexander Hamilton) ("[T]he plan of the convention aims only at a partial union or consolidation, the state governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States. This exclusive delegation, or rather this alienation of state sovereignty, would only exist in three cases: where the Constitution in express terms granted an exclusive authority to the union; where it granted in one instance an authority to the union, and in another, prohibited the states from exercising the like authority; and where it granted an authority to the union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*."). Further elaborating on this last category, Hamilton wrote that actual contradiction or repugnancy between state and federal law had to involve "direct contradiction of power," and not just "mutual[] questions of prudence." *Id.* For instance, both the State and federal government taxing the same item would not fall under the umbrella of actual contradiction or repugnancy, as "[t]he particular policy of the national and of the state system

19

Clark have explained, "[t]o find preemption of state authority consistent with the background rules governing the transfer of sovereign rights, the States' exercise of a given power assigned to federal officials must be fundamentally incompatible—or irreconcilable—with its exercise by the federal government." *Id.* at 613 n.440 (internal quotation marks omitted).

Justice Thomas has advocated the adoption of a "logical contradiction" test that is consistent with these understandings of the Supremacy Clause's text. As he has written, "[e]vidence from the founding suggests that, under the original meaning of the Supremacy Clause, federal law pre-empts state law only if the two are in logical contradiction." *Merck*, 587 U.S. at 319 (Thomas, J., concurring).[33]

---

of finance might now and then not exactly coincide, and might require reciprocal forbearances. It is not however *a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy, that can by implication alienate and extinguish a pre-existing right of sovereignty.*" *Id.* (emphasis added).

[33] Consistent with the text of the Supremacy Clause, Justice Thomas's approach requires that "Federal laws 'made in Pursuance' of the Constitution must comply with two key structural limitations in the Constitution that ensure that the Federal Government does not amass too much power at the expense of the States": the enumeration of limited federal powers, and the requirement "that pre-emptive effect be given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures." *Wyeth*, 555 U.S. at 585-86 (Thomas, J., concurring in judgment). *See also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1831, 694 ("[I]t will not follow, that acts of the larger society [the federal government], which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies [the States], will become the supreme law of the land. They will be merely acts of usurpation, and will deserve to be treated as such.").

This approach is grounded in the Supremacy Clause's history as a *non obstante* clause of the type used by "[e]ighteenth-century legislatures . . . to specify the degree to which a new statute was meant to repeal older, potentially conflicting statutes in the same field." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011) (plurality op. of Thomas, J.). As discussed above, "a *non-obstante* provision in a new statute acknowledged that the statute might contradict prior law and instructed courts not to apply the general presumption against implied repeals." *Id*. at 622 (internal citations omitted). Thus, "if we interpret the Supremacy Clause as the founding generation did, our task is straightforward. We must use the accepted methods of interpretation to ascertain whether the ordinary meaning of federal and state law 'directly conflict.'" *Kansas v. Garcia*, 589 U.S. 191, 214 (2020) (Thomas, J., concurring). "[P]re-emptive effect is to be given to congressionally enacted laws, not to judicially divined legislative purposes." *Arizona*, 567 U.S. at 440 (Thomas, J., concurring in part and dissenting in part).[34]

When two laws are asserted to be in conflict, the "logical contradiction" test replaces the traditional recency-based rule of priority

---

[34] Of course, Professor Nelson's and Justice Thomas's approach is not without its critiques. *See, e.g.*, Daniel J. Meltzer, *Preemption and Textualism*, 112 MICH. L. REV. 1 (2013); John David Ohlendorf, *Textualism and Obstacle Preemption*, 47 GA. L. REV. 369 (2013). These criticisms, however, tend to go to the technical implementation of this approach without substantively critiquing its originalist bona fides, and according to at least one scholar have been overstated. *See* Jesse Merriam, *Preemption as a Consistency Doctrine*, 25 WM. & MARY BILL RTS. J. 981, 1044 (2017). More importantly, there appears to be no evidence that the "purposes and objectives" test for evaluating implied obstacle preemption has any foundation in the original meaning of the Supremacy Clause whatsoever.

with a rule that gives priority to federal law. "Under this new rule of priority, when courts had to choose between following a valid federal law and following a state law, the federal law would prevail even if the state law had been enacted more recently." Nelson, *Preemption*, 86 VA. L. REV. at 250. This rule is broader than—and effectively subsumes—the Court's "narrow 'physical impossibility' standard" that Justice Thomas has criticized. *Wyeth*, 555 U.S. at 590 (Thomas, J., concurring in judgment).[35] Instead, the logical contradiction test ensures that states cannot enforce obligations on parties that compete with federal law.[36] Thus, a federal law protecting one's right to engage in certain behaviors

---

[35] As Justice Thomas has correctly noted, the overly broad sweep of "purposes and objectives" implied obstacle preemption has rendered it unnecessary for the Court to rely on its overly narrow "impossibility" preemption doctrine. *Wyeth*, 555 U.S. at 589-90 (Thomas, J., concurring in judgment). *See also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013) ("Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability."); *PLIVA*, 564 U.S. at 621 (plurality op. of Thomas, J.) ("We do not read the Supremacy Clause to permit an approach to pre-emption that renders conflict pre-emption all but meaningless. The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress.").

[36] As one commentator on Justice Thomas's view of logical contradiction has pointed out, "only actual conflict leads to preemption. Imposing an obstacle to achievement of federal purposes or objectives does not create preemption unless those purposes are based in the statutory language." E. Travis Ramey, *Congress Hatches the Egg: Justice Thomas's Textual Mandate Test for Preemption*, 62 ALA. L. REV. 1119, 1125 (2011). "When analyzing the pre-emptive effect of federal statutes or regulations validly promulgated thereunder, evidence of pre-emptive purpose must be sought in the text and structure of the provision at issue to comply with the Constitution." *Wyeth*, 555 U.S. at 588 (Thomas, J., concurring in judgment) (citing *Easterwood*, 507 U.S. at 664 (internal quotation marks and brackets omitted)).

trumps a state law that prohibits those behaviors.  *Wyeth*, 555 U.S. at 590 (Thomas, J., concurring in judgment).[37]

**B.**  **Implied obstacle preemption is unmoored from constitutional and statutory text and damages federalism and the separation of powers.**

Unfortunately, the current standard for implied obstacle preemption is far removed from the original meaning of the Supremacy Clause.  By grounding the inquiry in Congress's "purposes and objectives" in passing a statute, *Hines*, 312 U.S. at 67, implied obstacle preemption allows courts to "improperly rely on legislative history, broad atextual notions of congressional purpose, and even congressional inaction in order to pre-empt state law."  *Wyeth*, 555 U.S. at 594 (Thomas, J., concurring in judgment).  In practice, this approach allows judges to "wad[e] into a sea of agency musings and Government litigation positions" in a search for what Congress or federal administrative agencies "may have been thinking" when relevant provisions were drafted.  *Williamson v. Mazda Motor of Am., Inc.*,

---

[37] For example, Justice Thomas has explained that the "general express statutory goal" of the Motor Vehicle Safety Act, which was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," did not logically contradict allowing the plaintiff's common-law tort suit to go forward in *Geier v. American Honda Motor Co. See Wyeth*, 555 U.S. at 600 (Thomas, J., concurring in judgment) (citing *Geier*, 529 U.S. 888-89, 903 (2000) (Stevens, J., dissenting)).  "With text that allowed state actions like the one at issue in *Geier*, the Court had no authority to comb through agency commentaries to find a basis for an alternative conclusion."  *Id.* at 600 (citing 15 U.S.C. § 1381(k) (1988)).  "Because the 'requirement' imposed by state tort liability would have actually served the stated statutory purpose, and compliance with both state and federal guidelines was possible, the action should not have been preempted."  Ramey, *Congress Hatches the Egg*, 62 ALA. L. REV. at 1127.

562 U.S. 323, 341 (2011) (Thomas, J., concurring in judgment). And the "impossibility of defining 'purposes' in complex statutes at such a high level of abstraction" results in the "danger of invoking obstacle preemption based on the arbitrary selection of one purpose to the exclusion of others." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 678 (2003) (Thomas, J., concurring in judgment).

Such "freeranging speculation about what the purposes of the [law or] regulation must have been is not constitutionally proper in any case." *Williamson*, 562 U.S. at 343 (Thomas, J., concurring in judgment) (cleaned up). This speculation undermines federalism by overreading the Supremacy Clause's command to give preemptive effect only to the "Laws of the United States," and it erodes the separation of powers by empowering judges to act with "potentially boundless" discretion. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 908 (2000) (Stevens, J., dissenting).

Put simply, implied obstacle preemption is a doctrine of "freewheeling judicial inquiry"[38] that invites courts—including state courts—to become federal legislators, "wander[ing] far from the . . . text" of the supposedly preempting federal law. *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring in judgment).[39] Not only is the "evidence courts

---

[38] *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 459 (2005) (Thomas, J., concurring in judgment in part and dissenting in part) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)).

[39] Gregory M. Dickinson, *An Empirical Study of Obstacle Preemption in the Supreme Court*, 89 NEB. L. REV. 682, 701 (2011) ("[T]he key factor in Justice Thomas's preemption analysis is the explicitness of congressional action. Absent clear action by Congress to preempt state law, states should be

employ to discern congressional intent" dubious, the entire exercise of courts trying to "tease out single purposes or aims of federal legislation and regulations" is fraught with unsubstantiated assumptions about lawmaking and is inherently inconsistent with the separation of powers. Catherine M. Sharkey, *Against Freewheeling, Extratextual Obstacle Preemption: Is Justice Clarence Thomas the Lone Principled Federalist?*, 5 N.Y.U. J.L. & LIBERTY 63, 91 (2010). By its very nature, this "judicial guesswork about broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law"[40] encourages sharp, policy-based disagreements between judges that have little relation to actual statutory text—thus "undercut[ting] the principle that it is Congress rather than the courts that pre-empts state law."[41]

Moreover, the purposivist nature of implied obstacle preemption jurisprudence upsets the "delicate balance" of state versus federal power

---

presumed to retain their sovereignty. Any other approach would aggrandize the judiciary at the expense of the legislature and violate the principle of dual sovereignty enshrined in the Constitution.").

[40] *Garcia*, 589 U.S. at 214 (Thomas, J., concurring) (internal quotation marks omitted).

[41] *Gade*, 505 U.S. at 111 (Kennedy, J., concurring in part and concurring in judgment); *see also Walsh*, 538 U.S. at 682 (Thomas, J., concurring in judgment). Recent empirical research by Professor Jesse Merriam confirms this is the case. "The most sharply divided implied preemption cases on the Roberts Court have arisen under conflict preemption. Of the seven Roberts Court decisions [prior to 2017] finding conflict (impossibility or obstacle) preemption, four rested on razor-thin five-Justice majorities. By contrast, of the eleven cases [prior to 2017] finding express preemption, only one rested on a five-Justice majority, and that was likely a result of Justice Thomas not participating." Merriam, *Preemption as a Consistency Doctrine*, 25 WM. & MARY BILL RTS. J. at 1011 (footnotes omitted).

"mandated by the Constitution" by encouraging an overly preemptive reading of statutory text. *Wyeth*, 555 U.S. at 585 (Thomas, J., concurring in judgment). Empowering courts to "divine the broader purposes of the statute before [them] inevitably leads [them] to assume that Congress wanted to pursue those policies 'at all costs'—even when the text reflects a different balance." *Id.* at 601 (Thomas, J., concurring in judgment) (citing *Geier*, 529 U.S. at 904 (Stevens, J., dissenting)); Nelson, *Preemption*, 86 VA. L. REV. at 279-80). "As this Court has repeatedly noted, it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Wyeth*, 555 U.S. at 601 (Thomas, J., concurring in judgment) (citing *Norfolk So. R. Co. v. Sorrell*, 549 U.S. 158, 171 (2007); *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (internal quotation marks omitted)). In doing so, courts distort the text of statutes and stray from the actual command of the Supremacy Clause, which gives priority to the "Laws of the United States," not "agency musings, . . . Government litigating positions," or "the unenacted hopes and dreams" of executive branch agencies. *Williamson*, 562 U.S. at 341, 343 (Thomas, J., concurring in judgment).

On the other side of the coin, there is a notable lack of discussion in the jurisprudence regarding why the imaginative enterprise of implied "purposes and objectives" preemption is even necessary. The search for unspoken purposes certainly seems out of place regarding statutes like ICCTA, in which Congress chose to speak directly to its "pre-emptive intent" with the "best evidence" available: an express preemption clause. *Easterwood*, 507 U.S. at 664. And the field,

impossibility, and logical contradiction varieties of implied preemption amply guard federal law against state interference.[42]

Moreover, the current doctrine of implied obstacle preemption leaves many victims in its wake, indiscriminately preventing resort to claims, defenses, and enforcement actions provided by state and local law. The inconsistent application of obstacle preemption—which, as described above, is a near inevitability given its arbitrary and atextual nature—means that "[a]ll sides of the political spectrum have suffered as a result of the incoherence. Plaintiffs have been denied rightful remedies, businesses have operated in unpredictable legal environments, and most importantly for constitutional purposes, states have been arbitrarily deprived of their regulatory authority." Merriam, *Preemption as a Consistency Doctrine*, 25 WM. & MARY BILL RTS. J. at 1044.

For example, broad applications of implied obstacle preemption have affected plaintiffs and defendants of all kinds—individuals, business entities, and government agencies alike, including: a recording artist denied the right to assert state-law right-of-publicity claims;[43] a state agency stripped of its immunity defense;[44] a municipality left unable to fully enforce an ordinance designed to remedy hazardous

---

[42] As discussed above, the logical contradiction approach includes impossibility preemption. *See supra* at 22-23 and accompanying notes.

[43] *Jackson v. Roberts* (*In re Jackson*), 972 F.3d 25, 37-42 (2d Cir. 2020).

[44] *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 246-47 (3d Cir. 2009).

waste contamination;[45] individuals denied a remedy for improper scoring of their broker qualification exams;[46] a dismissed supervisory employee blocked from pursuing tortious interference claims against a union;[47] an employer prevented from pursuing claims for breach of contract, fraud, unauthorized use of property, and unjust enrichment against a former employee who falsified his employment application;[48] and ICU nurses deprived of claims under the Texas Whistleblower Act and employment discrimination laws.[49]   These cases illustrate that continuing to use current implied obstacle preemption precedents when we apply one of the "most frequently used doctrine[s] of constitutional

---

[45] *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 947-49 (9th Cir. 2002).

[46] *In re Series 7 Broker Qual. Exam Scoring Litig.*, 548 F.3d 110, 114-15 (D.C. Cir. 2008).

[47] *Loc. 926 Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 676-78, 684 (1983).  The examples in this and the next two footnotes concern the broadest implied preemption regime in American law, which currently governs labor relations under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).  Under this regime, the National Labor Relations Act "preempts state law even when the two only *arguably* conflict," in which case the National Labor Relations Board "resol[ves] . . . the legal status of the relevant conduct."  *Glacier Nw., Inc. v. Int'l Brotherhood of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776-77 (2023).

[48] *Wright Elec., Inc. v. Ouellette*, 686 N.W.2d 313, 322, 325 (Minn. Ct. App. 2004).

[49] *Castillo v. Brownsville-Valley Reg'l Med. Ctr., Inc.*, 421 S.W.3d 263, 272-73 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.).

law in practice"[50] presents a substantial threat to our constitutional system of federalism and separation of powers.[51]

Done right, implied preemption requires neither a "penumbral" reading of federal law, in which state-court jurisdiction over state claims is defined by the atextual whims of judges or federal administrative agencies, nor artificially narrow constructions of federal law that allow for overzealous protection of state law at all costs. Instead, it calls for a straightforward analysis of statutory text, amendment history, and structure—including applicable interpretive presumptions and clear-statement rules—to determine whether state and federal law establish irreconcilable standards that are in "logical contradiction" with each other.

## III. ICCTA obstacle preemption is inconsistent with the major questions doctrine.

Because ICCTA's preemption clause is coupled with a delegation of exclusive jurisdiction to the STB, the proper scope of implied ICCTA preemption should also be informed by relevant principles of administrative law. As explained above, the statutory interpretation question before us is not really about what state courts can do, but what Congress—which the federal Constitution vests only with specifically

---

[50] Gardbaum, *The Nature of Preemption*, 79 CORNELL L. REV. at 768.

[51] *See* Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 NOTRE DAME L. REV. 1417, 1418 (2008) ("The constitutional structure of the United States has two main features: (1) separation and equilibration of powers and (2) federalism. Each functions to safeguard individual liberty in isolation, but they provide even greater protection working together.").

enumerated powers—has actually delegated exclusively to an executive branch agency: the STB. Thus, I turn next to precedent and scholarship concerning the nature and power of the federal administrative state, which sheds substantial light on whether Section 10501(b) impliedly preempts Texas common law.

Applying current federal precedent on implied obstacle preemption in the ICCTA context makes little sense given developments in the Supreme Court's federal administrative law jurisprudence. In recent years, the Court has shown greater reticence to find legislative delegations of authority over "major questions" or matters of core state power to executive branch agencies absent "clear congressional authorization." *West Virginia*, 597 U.S. at 723 (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). But implied obstacle preemption takes the opposite view, concluding that *any* state-law obstacle to the "purposes and objectives" of Congress in passing a statute, including those Congress did not speak to at all, is preempted by the statute—no matter how "major" the displacement of state law.

In the case of ICCTA preemption, these conflicting positions come to a head. While federalism principles underlying the major questions doctrine counsel that Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power,"[52] current implied obstacle preemption precedent eschews

---

[52] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (quoting *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020)).

statutory text and clear statements in favor of "penumbras that wax and wane."[53]

Here, KCSR asserts that the STB has exclusive jurisdiction to provide a remedy any time the application of state or other federal law would unreasonably burden or interfere with rail transportation. In other words, the STB has almost plenary authority over rail transportation under KCSR's view of Section 10501(b), meaning that any action taken under state or other federal law that unreasonably impacts a railroad's bottom line impliedly falls within the STB's exclusive jurisdiction and is preempted by ICCTA. Because KCSR frames ICCTA's preemptive scope at such a high level of generality, adopting its position would undermine the federalism and separation of powers values that inform the nondelegation doctrine and its corollary, the major questions doctrine.[54]

In particular, KCSR's position should be rejected because it (1) implicates the major questions doctrine and (2) does not meet its

---

[53] *Glacier Nw.*, 598 U.S. at 787 (Thomas, J., concurring in judgment) (internal quotation marks omitted).

[54] In his *West Virginia* concurrence, Justice Gorsuch noted that the Supreme Court "has applied the major questions doctrine for the same reason it has applied other similar clear-statement rules—to ensure that the government does not inadvertently cross constitutional lines. And the constitutional lines at stake here are surely no less important than those this Court has long held sufficient to justify parallel clear-statement rules. At stake is not just a question of retroactive liability or sovereign immunity, but basic questions about self-government, equality, fair notice, federalism, and the separation of powers. The major questions doctrine seeks to protect against unintentional, oblique, or otherwise unlikely intrusions on these interests." 597 U.S. at 742 (Gorsuch, J., concurring) (internal quotation marks and citations omitted).

clear-statement requirement. The Supreme Court's major questions and nondelegation cases teach us that "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *West Virginia*, 597 U.S. at 723 (internal quotation marks omitted). "We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* (quoting *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc)). Thus, when a litigant argues that a statute grants an agency "sweeping" authority over matters of "economic" or "political significance," it must point to "clear congressional authorization for the power" claimed. *Id.* at 766 (internal quotation marks omitted); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring).

Supreme Court precedent indicates that whether an agency possesses exclusive power to regulate everything that unreasonably burdens or interferes with rail transportation qualifies as a major question, and relatedly as a question on which Congress must speak clearly if it wishes to displace core state power. Indeed, one of the earliest cases in which the Supreme Court applied what has come to be known as the major questions doctrine involved whether the STB's predecessor—the ICC—could set carriage prices for railroads. The Court observed that transferring such a "power of supreme delicacy and importance" to "any administrative body is not to be presumed or implied from any doubtful and uncertain language." *ICC v. Cincinnati, N.O. & T.P.R. Co.*, 167 U.S. 479, 505 (1897). If Congress "had intended to grant the power to establish rates, it would have said so in

32

unmistakable terms." *Id.* at 509.  Because Congress "did not give [that] express power to the commission," the Court concluded "it did not intend to secure the same result indirectly . . . ." *Id.* at 511.

KCSR's view of Section 10501(b) would similarly vest the STB with a "breathtaking amount of authority." *Ala. Ass'n of Realtors*, 594 U.S. at 764.  "It is hard to see what ["remedies"] this interpretation would place outside the [STB's] reach, and [KCSR] has identified no limit in [Section 10501(b)] beyond the requirement" that the state-law claim have the effect of regulating or interfering with rail transportation.  *Id.* at 764-65.

KCSR's attempt to downplay that vague and far-reaching standard by arguing that ICCTA only preempts "unreasonabl[e] interfere[nce] with its operations" fares no better than the CDC's argument that its authority under the Public Health Service Act[55] was limited to actions that were "necessary" to curb the spread of COVID-19.  *Id.* at 765.[56]  The Supreme Court rejected the CDC's reading of a statute that would vest it with authority to "mandate free grocery delivery to the homes of the sick or vulnerable," "[r]equire

---

[55] 42 U.S.C. § 264.

[56] Indeed, KCSR's argument here arguably fares *even worse* than the CDC's argument in *Alabama Association of Realtors*, as the word "necessary" actually appeared in the relevant statutory provision.  In contrast, "unreasonable interference with operations," "allocat[ion] [of] capital resources," and the other phrases KCSR argues define the scope of the STB's powers under Section 10501(b) are nowhere to be found in the text of that Section.  The concept of an "unreasonable burden" does appear in other parts of ICCTA, confirming that Congress deliberately chose to use a different standard in this general preemption provision.  *See, e.g.*, 49 U.S.C. §§ 10909(a)(1), 10910, 11501.

manufacturers to provide free computers to enable people to work from home," or "[o]rder telecommunications companies to provide free high-speed Internet service to facilitate remote work." *Id.* Similarly, we should reject KCSR's reading of a statute that would, for example, grant the STB exclusive jurisdiction to adjudicate contractual disputes between railroads and their energy suppliers, resolve labor disputes between railroads and their employees, or regulate the securities issued by railroads.[57]

There is no doubt that a railroad with no fuel, no workers, or no access to capital markets would be facing "unreasonable interference with its operations" and vast impacts on its bottom line. But no one seriously contends that the STB actually could—or would—attempt to govern any of these things, lest it upset separate statutory schemes.[58]

---

[57] That these arguments are being advanced by a party other than the agency administering a particular statute makes no difference for purposes of the major questions doctrine, which seeks to define the scope of an agency's powers under that statute. Indeed, the U.S. Supreme Court's decision in *West Virginia* involved rejecting the arguments of the EPA, several power companies, and various states in defense of the Clean Power Plan—with all of these parties arguing for a broader reading of the EPA's powers under the Clean Air Act.

[58] *See Biden*, 143 S. Ct. at 2382 (Barrett, J., concurring) ("Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse."). For instance, allowing the STB to resolve labor disputes between railroads and their workers would undermine the statutory scheme laid out in the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, which is administered by the National Mediation Board, another independent federal agency. Similarly, allowing the STB to regulate the securities issued by KCSR would intrude on the Securities and Exchange Commission's authority under federal securities laws. *See, e.g.*, 15 U.S.C. §§ 77a *et seq.*, (Securities Act of 1933); 15 U.S.C. §§ 78a *et seq.* (Securities Exchange Act of 1934).

And rightfully so, as neither the STB's expertise nor its statutory mandate actually implicates *any* of these potential legal disputes, even though they are related to a railroad's "operations" and its financial health.

The same is true of routine, common-law negligence disputes of the type at issue here. KCSR concedes that several types of negligence claims—such as failure to sound a whistle, keep a lookout, apply brakes, or maintain a yield sign—would not be preempted. This concession highlights that there is no coherent limiting principle to KCSR's view of implied ICCTA preemption, as the impact of these claims on railroad operations is not different in *kind* from the plaintiffs' humped-crossing negligence claim, and we have only KCSR's unsupported assertion that they differ in *degree*.

KCSR's position also meets two of the three major questions doctrine "triggers" that Justice Gorsuch identified in his *West Virginia* concurrence. 597 U.S. at 743-44. KCSR's reading of Section 10501(b) to give the STB exclusive jurisdiction over any actions that unreasonably burden or interfere with rail transportation would vest the STB with almost unlimited authority to regulate the railroad industry, boxing out all other "regulation of rail transportation"—no matter how indirect—under state and other federal laws. Thus, KCSR's interpretation of ICCTA would empower the STB to "regulate a significant portion of the American economy" from under the shield of *Chevron* deference.[59] *Id.*

---

[59] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) (holding that where statute is "silent or ambiguous with respect to [a] specific issue," courts must grant deference to reasonable interpretation advanced by federal administrative agency administering that statute).

at 744 (Gorsuch, J., concurring) (internal quotation marks omitted); *see Biden*, 143 S. Ct. at 2373 (holding student loan forgiveness program met this indicator of a major question).

And it would do so in a manner that "intrude[s] into an area that is the particular domain of state law": the care of grade crossings. *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring); *see Lehigh Valley R.R.*, 278 U.S. at 35. The STB's assertion of exclusive jurisdiction over ordinary common-law claims, such as the one at issue here, would not amount to an "everyday exercise of federal power," as it would dramatically displace the role of state courts and state common law in an area they have traditionally governed and that falls squarely within their function and expertise. *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (quoting *In re MCP No. 165*, 20 F.4th 264, 272 (6th Cir. 2021) (Sutton, C.J., dissenting from denial of initial hearing en banc)); *see also Ala. Ass'n of Realtors*, 594 U.S. at 764 (holding CDC's eviction moratorium "intrude[d] into an area that is the particular domain of state law: the landlord-tenant relationship").

KCSR's assertions to the contrary conflict with the longstanding—and constitutionally protected—norm that "the States, not the Federal Government, are the traditional source of authority over safety, health, and public welfare. In the context of a vast attempt to assume these police powers by the Federal Government, Congress must speak unequivocally." *In re MCP No. 165*, 20 F.4th at 273 (Sutton, C.J., dissenting from initial hearing en banc). For these reasons, KCSR's position would yield a significant expansion in the powers of the federal

36

administrative state with severe consequences for federalism and the separation of powers.

As the dissent in the court of appeals correctly pointed out, the importance of this issue is especially apparent in Texas. 666 S.W.3d 1, 19 (Tex. App.—Dallas 2021) (Carlyle, J., dissenting). According to preliminary data provided by the FRA, Texas led the country in highway–rail grade crossing collisions in 2023—with 246 of the country's 2,190 collisions happening in our state.[60] We also had the most injuries of any state (76 out of 761 nationally), and reported the second-largest number of fatalities (16 out of 248 nationally).[61] Texas also has the most miles of freight railroad in the United States, with rail transportation directly impacting almost 18,000 jobs in the state and 0.5 percent of our state's economy.[62] Making state law inapplicable to all this activity would have substantial consequences for Texas's sovereignty and economy.

In sum, the "sheer scope" of the STB's jurisdiction under KCSR's position invokes the major questions doctrine, as it would vest the STB with a "breathtaking amount of authority," *Ala. Ass'n of Realtors*, 594 U.S. at 764, to assert exclusive jurisdiction over anything that could be

---

[60] *See Collisions & Fatalities by State, Highway–Rail Grade Crossing Collisions—Top 25 States*, OPERATION LIFESAVER (updated June 6, 2024), https://oli.org/track-statistics/collisions-fatalities-state (last visited June 20, 2024).

[61] *Id.*

[62] *Texas Rail Plan Executive Summary*, TEX. DEP'T OF TRANSP. (Dec. 2019), https://ftp.dot.state.tx.us/pub/txdot-info/rail/texas-rail-plan-executive-summary.pdf.

viewed as unreasonably burdening rail transportation. As the Supreme Court has held, such sweeping administrative power requires clear congressional authorization. *West Virginia*, 597 U.S. at 723.

Turning to the doctrine's second step (its clear-statement requirement), ICCTA expressly grants the STB exclusive jurisdiction only over transportation by rail carriers, remedies with respect to specified carrier actions, and uses of railroad facilities. *See* 49 U.S.C. § 10501(b). Yet KCSR asks us to implicitly delegate more power to the STB through an ancillary preemption provision that does not directly address the nature or scope of its exclusive jurisdiction and that we have held is inapplicable to this case by its own terms. And KCSR does so despite the FRSA provision saving state laws and suits regarding railroad safety as well as the STB's own view that it has no such jurisdiction. This "oblique" approach to jurisdiction is insufficient to satisfy the major questions doctrine. *West Virginia*, 597 U.S. at 723. For this additional reason, I disagree with KCSR that any action taken under state or other federal law that unreasonably burdens or interferes with rail transportation impliedly falls within the STB's exclusive jurisdiction and is preempted by ICCTA.

## IV.   ICCTA obstacle preemption is inconsistently applied and unworkable in practice.

Finally, ICCTA obstacle preemption analysis is fundamentally broken and unworkable, as the deep split among lower courts makes clear. Rather than asking judges to evaluate structural relationships between state and federal law, obstacle preemption asks judges to do nothing short of reading legislators' minds. That enterprise is foreign to

38

the judicial role, which requires us to read text in context—not tea leaves, tarot cards, or the unspoken thoughts, feelings, and trepidations of individual legislators.

Arguments for ICCTA obstacle preemption of state common-law claims often turn on technical, fact-intensive disputes that require courts to decide when the aggregate effects of state tort suits generate an "unreasonable" burden on rail transportation. This approach gives courts almost boundless judicial discretion while placing a thumb on the scale in favor of preemption, as it enables railroads to argue that almost anything has some "effect" on their profits. *See Hall v. United States*, 371 F.3d 969, 977 (7th Cir. 2004) (Easterbrook, J., dissenting) ("Effects are ubiquitous. A koala's choice among tasty eucalyptus leaves in Australia could change the weather in Alaska."). In addition, some circuits finding ICCTA obstacle preemption rely on the same sort of speculation about hypothetical future consequences that the Supreme Court has rejected in the FDA preemption context.[63]

At its core, the current obstacle preemption approach includes no meaningful limits other than a judge's willingness to ask what the

---

[63] *Compare Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 681 (7th Cir. 2011) (concluding that Chicago Transit Authority's attempted condemnation of property owned by Union Pacific was impliedly preempted because "[e]ven if the property was not being used and Union Pacific had no immediate plans to use this property, a taking of this property would still prevent Union Pacific from using it for railroad transportation in the future"), *with Merck*, 587 U.S. at 321 (Thomas, J., concurring) ("Merck's primary argument, based on various agency communications, is that the FDA would have rejected a hypothetical labeling change . . . . But . . . hypothetical future rejections [do not] constitute pre-emptive 'Laws' under the Supremacy Clause.").

impact of a legal claim on a railroad might be—which in turn requires a review of abstract congressional "purposes." The resulting jurisprudence has been predictably bumpy, as the Court summarizes in Part II.C. of today's opinion. For example, while some circuits have been willing to reject obstacle preemption when particularized evidence of an unreasonable burden is lacking,[64] others have simply declared that state-law claims would impact construction or maintenance of a rail line and are therefore preempted.[65]

This complexity and inconsistency also exists within circuits. *Compare, e.g., Adrian & Blissfield R.R. Co. v. Village of Blissfield,* 550 F.3d 533, 541-42 (6th Cir. 2008) (holding Michigan statute requiring

---

[64] *See Franks,* 593 F.3d at 414-15 (holding "state law actions can be preempted as applied if they have the effect of unreasonably burdening or interfering with rail transportation," but ICCTA did not impliedly preempt state-law action for use of private railroad crossings because testimony was not specific to crossings at issue); *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield,* 550 F.3d 533, 541-42 (6th Cir. 2008) (holding Michigan statute requiring railroads to construct, or compensate municipalities for constructing, sidewalks across railway crossings was not impliedly preempted because it was not "unreasonably burdensome and d[id] not discriminate against railroads" even though it might prevent them from maximizing profits); *Emerson,* 503 F.3d at 1133-34 (holding no preemption of state-law tort claims for railroad's failure to dispose of old railroad ties properly or maintain vegetation along right-of-way because record did not clearly address how railroad would fix problem).

[65] *See Tubbs v. Surface Transp. Bd.,* 812 F.3d 1141, 1145-46 (8th Cir. 2015) (concluding common-law negligence suit would "subject construction of elevated railroad embankments to state regulation . . . via negligence"); *Chi. Transit Auth.,* 647 F.3d at 681; *cf. Edwards v. CSX Transp., Inc.,* 983 F.3d 112, 122-23 (4th Cir. 2020) (holding common-law tort claims seeking damages for flood-related losses caused by railroad's unwillingness to allow sandbagging along right-of-way were expressly preempted as "direct attempts to 'regulate' railroading").

railroads to construct, or compensate municipalities for construction of, sidewalks across railway crossings was not impliedly preempted by ICCTA), *with CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 283-84 (6th Cir. 2019) (holding municipal ordinance requiring railroad to obtain city council approval before changing grade at any crossing was impliedly preempted because it was not "settled and definite enough to avoid open-ended delays" and forced railroad to use certain maintenance methods to correct fouled ballast).  Under the plain text of ICCTA, there is no discernible difference between these forms of "regulation," and it is hard to see how requiring a railroad to build sidewalks at crossings is not in "logical contradiction" to ICCTA's statutory scheme while requiring it to use certain maintenance methods at crossings is.  In a legal regime this chaotic, nobody wins.

## V.  Plaintiffs' claims against KCSR are not impliedly preempted by ICCTA.

Because implied obstacle preemption of any state law that unreasonably burdens rail transportation is unworkable and inconsistent with the Supremacy Clause and the major questions doctrine, I conclude by explaining how an ICCTA implied preemption analysis should proceed consistent with those principles.  Because there is no "direct conflict"[66] or "logical contradiction"[67] between plaintiffs' common-law tort claims and ICCTA's grant of exclusive jurisdiction to

---

[66] *Wyeth*, 555 U.S. at 590 (Thomas, J., concurring in judgment).

[67] *Merck*, 587 U.S. at 319 (Thomas, J., concurring).

the STB under Section 10501(b), their claims should not be impliedly preempted.

Allowing plaintiffs' claims to proceed in state court does not contradict ICCTA's statutory scheme, which centralizes and simplifies the economic and operational regulation of railroads without intruding on state regulation of railroad safety allowed by FRSA. By proceeding with their state-court suit, plaintiffs are not seeking to prevent KCSR from engaging in conduct that federal law expressly protects. *See Wyeth*, 555 U.S. at 590 (Thomas, J., concurring in judgment). And as noted above, neither the STB—which has no expertise in railroad safety—nor any other federal agency has promulgated standards governing humped crossings. Instead, FRSA's savings clauses and a century of jurisprudence demonstrate that railroad safety is governed by a regime of cooperative federalism, not top-down federal uniformity as with the economic regulation of railroads (particularly mergers and acquisitions). Moreover, as the dissenting justice in the court of appeals pointed out, Congress expressly delegated relevant duties to the states in 2015, requiring them to develop state-specific safety plans for highway-rail grade crossings.[68]

By using the logical contradiction test to review the textual details of federal and state law regulating railroad crossings, as well as KCSR's legal obligations to both sets of sovereigns, a factually intensive ICCTA obstacle preemption inquiry could be avoided. But regardless of

---

[68] 666 S.W.3d at 21 n.5 (Carlyle, J., dissenting) (citing Fixing America's Surface Transportation Act, Pub. L. 114-94, § 11401, 129 Stat 1312, 1679-81 (2015)).

which implied preemption test is used, KCSR's implied preemption argument is wholly unsatisfying. KCSR maintains that if this common-law negligence suit is allowed, it will face inconsistent legal liabilities in various courtrooms around the state—and the costs of this legal uncertainty, anticipatory compliance measures, and possibly a few unfavorable verdicts in future cases will aggregate into a substantial sum. Perhaps. But even if the STB decided at some point to regulate humped crossings under the jurisdiction KCSR asserts it has (despite not doing so in the last 28 years), it is difficult to see how giving the five-member STB exclusive jurisdiction over thousands of routine, fact-intensive claims of common-law negligence at rail crossings would make the legal picture any more consistent for KCSR or, for that matter, any cheaper.

In short, because there is no textual evidence of a "direct conflict" or a "logical contradiction" between KCSR's obligations under state and federal law, as well as ample evidence that Congress had no desire to establish such a conflict, ICCTA does not impliedly preempt plaintiffs' humped-crossing negligence claim according to the original public meaning of the Supremacy Clause.

## CONCLUSION

In Federalist 51, James Madison laid out the nature and purpose of our federal constitutional structure:

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people.

43

> The different governments will control each other, at the same time that each will be controlled by itself.[69]

Commenting on this passage, Justice Antonin Scalia observed that "[t]hose who seek to protect individual liberty ignore threats to this constitutional structure at their peril."[70]

The current doctrine of implied obstacle preemption presents such a peril because it allows courts to seize power for themselves (and often for federal executive branch agencies), undercutting the norm that Congress must speak clearly when it seeks to delegate powers to other branches or displace the traditional police powers of the States. Just as Congress "cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David," *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring in judgment), the Judiciary cannot glue new pieces of marble onto Congress's David whenever it thinks Congress's aesthetic "purposes and objectives" would be advanced. "[T]hat is not a path the Constitution tolerates." *Id.* (Gorsuch, J., concurring in judgment). Although recent decades' debates about federal structural constitutionalism have been most vigorous in

---

[69] FEDERALIST NO. 51 (James Madison).

[70] Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 NOTRE DAME L. REV. at 1418. *See also Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) ("The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government . . . . Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours.").

other arenas,[71] the Supremacy Clause and implied preemption doctrine implicate the very same questions about the Framers' choice to diffuse power across the federal government and the states and among the different branches, lest a concentration of those powers undermine the people's liberty.

Because preemption issues are so frequently litigated, implied obstacle preemption's distorted application of the Supremacy Clause is perhaps one of the most damaging constitutional doctrines of modern times. It has undermined the "double security" the Framers sought to guarantee Americans, replacing it with judicial arbitrariness, confusion, and the substantive loss of rights. It is unmoored from the original public meaning of the Constitution, and it is in irreconcilable tension with the Supreme Court's administrative law jurisprudence protecting federalism and the separation of powers through the major questions doctrine. I urge the Supreme Court to reexamine its implied obstacle preemption jurisprudence and adopt an approach consistent with the original public meaning of the Supremacy Clause.

With these concurring thoughts, I join the Court's opinion.

---

[71] *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023); *Gundy v. United States*, 588 U.S. 128 (2019); *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *Printz v. United States*, 521 U.S. 898 (1997); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996); *New York v. United States*, 505 U.S. 144 (1992).

_____
J. Brett Busby
Justice

**OPINION FILED:** June 28, 2024